Last case for today and for this panel, Freddie Friedrichs, I believe, v. Vandwell K. Robinson and others. We'll hear first from Mr. Giannott. May it please the Court, Dominic Giannott for the appellates. This is, on the surface, a simple personal injury case that took some strange twists. And the twists it took is that late evidence was permitted by the trial court, by the trial court, and we warned the court that this would be a problem. Both the court and counsel, we tried to accommodate the plaintiffs who were not citizens of Louisiana. In fact, Mr. Freitas is a Venezuelan citizen. So we all tried to accommodate him. Witness list filed. Exhibit list filed. Pre-trial conference. We had a pre-trial conference with the court. And we filed a motion to continue because we found out that Mr. Freitas was not going to be able to come back to the country until very close before the trial. And so we all agreed on independent medical examination. And, of course, we assumed that the plaintiffs wanted to have their client examined too. So we had the pre-trial conference. The judge denied the motion to continue and said, Bring it up later. See what you can do. We had a settlement conference. And then we found out that he's not going to be back until the week before trial. Three days after the pre-trial conference, after the witness list is closed, after the pre-trial order has been accepted, we get three photographs, which purport... How long was this before the trial occurred? I'm sorry, Your Honor. How long was this, the pre-trial conference that you're referring to, how long did it occur before the trial itself commenced? The pre-trial conference was July 10th. The trial was July 31st. So three days later, we get three photographs, which we had not seen before, which purport to show the plaintiff playing guitar. We found out the motion continued. This is new stuff. He's in Venezuela and we can't redepose him. Judge, give us a short time to do this. Judge said, I'll take it under advisement. His playing the guitar didn't... I'm sorry, Your Honor. His playing the guitar didn't come up during the deposition. Yes, yes. The plaintiff mentioned that he plays guitar at church. That's fine. He's right-handed. The medical says he's right-handed. Well, the photographs raise more questions than they answer. The photograph purported to show his playing in the church, or was it in the church? No, the photographs show him playing... Okay, playing it. Was this photograph demonstrative of his condition before or after the accident? This was before. These were dated 2012, one date. And they show him playing guitar apparently in a school. So we go back to the judge and said, what's this all about? And the judge says, keep going. So we keep going. And it came up at trial. The reason why this is important is that guitar is my instrument. The guitar shows Mr. Freitas playing guitar left-handed, not right-handed. And the injury is to the right wrist. Something wrong here. So we carried on. We find out that Mr. Freitas cannot come back to the country until right before trial. We set an examination. Okay, now how long was this before the trial date that these photographs were admitted? The trial judge permitted the amendment of the pretrial order on... July 17th, about four days after the motion to supplement was filed. So July 17th, which is 14 days before trial, maybe 10 working days before trial. So we asked the judge again, judge, really, what's this about? Carry on. So we set... Counsel and I worked together. We worked together. Judge Feldman, many years. Because of his problems, I said, let's set the independent medical exam on the Monday before the trial. That's what we can do. Now, Mr. Freitas can't get here. All right. So we had the independent medical exam the Wednesday before the Monday at trial. And then we find out that because of Mr. Freitas' visa problems, he was going to be examined by his own doctor, which we knew, but not until the Friday before the trial. And so at 2.30 or 3 o'clock on Friday afternoon before trial, we get this two-page report. At trial, and it was a bench trial, Mr. Freitas' case was kind of secondary. The driver's case was first. It was a jury trial. We settled that case. And so with the court's permission, we said, let's do a bench trial. Let's stipulate to the medical. Let's do it quick. So we all agreed to that. That was fine. So we go to the trial, and then suddenly the number one complaint of the plaintiff is about the guitar playing in the Catholic Church. Now, I was not able to do any discovery about those photographs, which appear he's playing guitar left-handed and not right-handed. Now, is the plaintiff the only witness, the only live witness that was presented? One and only one witness, Judge Jolly. The other plaintiff was sitting in the courtroom and never testified. There was no corroboration to any of this. It was just the plaintiff. And suddenly it's about playing in the Catholic Church. We had no discovery, and so the first rule of trial advocacy, don't ask a question that you don't know the answer to. Because if I suggest something, are you right-handed or left-handed, the judge is going to say, what's your evidence? I don't have any because I couldn't do any discovery. I pointed it out to the judge in closing argument. The other issue, of course, is that the judge considers – I don't think you would be prohibited from asking him that question. Oh, no, sir, but suppose he denies it and – I mean, you have to ask a question that you have a good faith basis for, to have a good faith basis. And a relevant question as to whether he's left-handed or right-handed. Yes, sir, it's a critical question because he's got to heal fresh – You're saying you did not ask it or you did ask it? He said he played guitar and he didn't say anything about right or left-handed on the witness stand. What did you say? Did you cross-examine him about that? No, because it had no ammunition in case he denied it. Suppose he said, I was just playing guitar left-handed, that day I played both. He didn't say he was right-handed? I'm sorry, Judge? He said he was right-handed. Yes, sir. Or a doctor said he had it. The doctor said he was right-handed. Everybody says he's right-handed. Well, you've got to use both hands to play a guitar, don't you? You do, and that's a good point, Your Honor. If you're right-handed, you play a guitar this way, you press the strings this way, and you strum this way. If you're left-handed, you do the opposite. These pictures show him playing left-handed. He complained he couldn't play guitar in church, and the judge focused on that. I mean, he lectured me, basically. Your presentation is good, but what's the complaint? You couldn't cross him on the left-right hand or the church because the photos that were allowed, once you had the pretrial order and then there's an amendment to allow the photos, those have nothing to do with the church. No. So the argument you've made now to us is that Judge Feldman abused his discretion allowing the amendment, or are you talking about the refusal to continue? Both. I know, but which is your – why don't you go issue by issue? Okay. When he allowed the amendment, he said, I'll allow the amendment. That has nothing to do with the church. No. Spiritual consent. Exactly. No, that came up at the trial when everybody was talking about – But you're prepared for that. There's no issue. Well, I'm prepared for that. The pretrial order has nothing to do with that. Right. No, nothing there. The whole church – well, we had this discussion about the Catholic Church at the pretrial and three days later come these photographs and then at trial the plaintiff says the number one complaint is – Wait a minute. You had a discussion pretrial at the pretrial conference? Yes, sir. About the Catholic Church. It was just an informal thing. All of us in this case have known Judge Feldman forever. Was it relevant to any issue or was this just a conversation? No, sir. No, it was just a casual conversation. I asked him how is Mrs. Scalia. I grew up in Queens. I know where the Scalia family is. And that's how it started and he told us about his religion. I'm not bandying about. I know it's being – but that's how it started. And three days later we get these photos playing that and then we have the focus on playing the church, which is fine. All we asked the judge for was a little continuance. So that's your central thrust. District courts have a lot of discretion to amend. The amendment was only three days later. It's three or four photos. But so the central thrust is the doctor-physician on the Friday before. Is that – That's – there are two. The photos. Okay. Just ask – give me a half-hour deposition in Mr. Freitag so I can find out what this is about. And number two, for heaven's sakes, the doctor is examining him on the Friday before a trial. How am I going to examine him before the trial on Monday? But it's the interrogatories. You knew he was a guitar player. So there's no reason you couldn't have deposed him as to how do you play and you've got the car accident. You've got your one wrist. What's your talk about that? Exactly. How can I predict that there would be photos that's showing him playing left and even gone now? Okay. Because everything in the record says he's right-handed. I guess if district judges have a lot of discretion to deny a continuance, it would seem compelling here. Two features seem compelling, which is, one, the medical report Dr. Gladden generates is given to both sides on the same day. They didn't get it any earlier than you. And number two, we all acknowledge this is a man who has visa troubles and he just couldn't get in before. Right. We accepted that. Those are fairly compelling reasons for Judge Feldman to say, you know, this is difficult, but both sides are equally challenged. We're going ahead with the trial. The problem with this whole thing, though, is that Dr. Gladden becomes suddenly the treating physician. As you know, in Louisiana law, the treating physician is given a lot more weight than the guy examined one time. That's a separate issue, though, and it does seem like the medical records show that he was the supervising treating physician. He wasn't treating. Well, but he didn't actually do the surgery. But, you know, I think that's pretty much how it works. He's there and the junior person's going and he can step in if something goes wrong. That's not a – But the medical record shows Dr. Gladden never examined the guy. So he examined him one time only, the Friday before trial. Dr. Williams examined Mr. Freitas the Wednesday before trial. Judge Feldman just discounted Dr. Williams, who did 42 tests and gave treating physician status to Dr. Gladden, who never saw the man, according to the record, the Friday before trial. Okay, that's – are you sure about that statement? Yeah. Never saw him? I didn't get that in the record. His name is in the record, but next to his name is never any physical exam, any diagnosis. Wasn't he present during the surgery? I'm sorry, Judge? Wasn't he present during the surgery? The operative report written by Dr. Smith says he was there and available for the key portions. Yes, he was there in the operating room to do the operation. So he did see the man then. I don't know. There's not a note from Dr. Gladden in this record. I wish I knew. I would have asked him. You know, one thing that you might touch on a little bit that seemed to be a culpable issue that you raised was the absence of mitigation in this case. That's another big issue. Mitigation is a huge issue. The plaintiff admitted that he did not mitigate his – He didn't admit that. I thought he claimed that he worked with objects like rubber balls and maybe big cans of fruit or something. He admitted that he was told he needed formal physical therapy rehab. But this is a six-month injury. He admitted at the trial that he didn't do that. Now, they introduced a Spanish record from a radiologist. Apparently, it says he was squeezing a ball, but that's not rehab. And our doctor said that's not rehab. And even Dr. Gladden said he'd be fine with the rehab. So he did admit at trial that he didn't do the prescribed physical therapy. But Judge Feldman did address the issue. He said, you know, it's unresolved exactly what, disagreement, the hope for it, he's down there in Chile or whatever. But then he ultimately appears to have done an implied balancing and said, I've got to the number that I've gotten to. Yes. So did he – how much, actually, did he give Mr. Fractiz before he did the mitigation? Did he give him $500,000? I mean, one of our points is that this is the highest whatever given in any Louisiana cases for a simple fractured wrist that both doctors say. Louisiana law would control what's your best Louisiana case that that type of resolution of mitigation is reversible error. What's your best case? Remember, Louisiana appellate courts, they don't reverse the remand. They just decide. Okay. And when there's no mitigation, what courts usually do is they take a percentage. We believe that 25 percent is appropriate or 50 percent is appropriate. That's what they do. Louisiana appellate courts don't reverse the remand. And so the best case describing your view of how this should have done is what? I think because he admitted that he didn't do any physical therapy, he was getting free care, didn't do rehab. I think 25, 30 percent is fair. I'm not saying that – I'm not saying a man shouldn't get money for the injury. Of course he should get the injury. I'm not saying that. Got a red light there. Yes, sir. Thank you, Your Honor. Thank you. Thank you. I'm Richard Martin, and I'm along with Frank LaMotte, and I've had the privilege of representing Professor Freddy Freitas, who is a citizen of Venezuela currently living and working in Chile, who was the victim of a terrible accident a couple of years back. I really don't know where to start because we've been all over the page. I've briefed the issues. But the central thesis, as I gathered from the request for oral argument, that was somehow Judge Fellman and I engaged in some sort of religious conspiracy to deprive the defendants of a fair trial. They say, can a trial by ambush be sanctioned by a court? The scope and the depth of the injustice done. A discussion of religion. None of that happened. What we hear about are – It does appear to me, though, I mean it does appear to me that it was a rushed trial, given the circumstances of the individual living out of the country and not being able to be here. Were they deprived of an opportunity to depose him? No, sir. Okay. And I'll tell you why. First of all, Mr. Freitas lived 4,500 miles away one way. That's the same distance, Santiago, Chile. It's the same distance as between New Orleans and London. He was readily available by Skype on a high-speed Internet video connection. That's how we deposed him. We met with magistrate Judge Janice van Mierveld, and she said this is too expensive just to depose him by video. Now – Did that happen? Yes, sir. That's exactly what happened. And how long before the trial did that occur? Oh, it happened in May. It happened several months before the trial. And, in fact, one of the most interesting things is one of the questions posed during the deposition by Mr. Rudin to my client was, are you a lefty or a righty? He asked him that question. And the answer he got, that's exhibit number two in your bench book, exhibits. He said, I am a righty most of the time. And then he also described how he wrote right-handed most of the time, not all of the time. They had every opportunity to question Mr. Freitas. Now, let's talk about these pictures. My records indicate that when I served discovery responses on March 9, 2017, about 150 days before the trial, I referenced, in parentheses, see photos. That's exhibit number one, a copy of my interrogatory answers. And that's also in my brief. So my recollection is three or four photos of the guitar went over and a basketball picture. So those things should have been available when Mr. Freitas was deposed. But let's assume I somehow forgot to do it. Those pictures were given to the defendants 20 days before trial. The first time they got them before trial or in close proximity to trial was when I asked for their consent to amend the pretrial order. It's a matter of courtesy. Sent them my brief and the four pictures I wanted to add. Now, they had 20 days. If they would have come to me and said we want to redepose Freitas, fine. They could have done that. Could have set it up in an hour. Now, they didn't question Mr. Freitas at trial about those pictures. They could have. They didn't do it. Those pictures also were admitted into evidence. They objected in terms of the motion to supplement the pretrial order. Judge Feldman said no, sorry. But at that time, they had already gotten an extensive interrogatory answer, number 17, about Mr. Freitas' disabilities, including the guitar and the other things. Then they deposed him, and he said the same thing. So none of this is new. They were well aware of his pastime or his ability and interest in playing the guitar. It's like I've been complaining for months about the terrible wreck I was in, and finally you see a picture of the car. You already know I've been in a wreck, and it's bad. Okay, now why were you introducing these pictures? Why were you introducing pictures of his playing the guitar? Because Mr. Freitas had several hobbies that he used to enjoy. One was playing guitar. One was playing basketball. He testified that they were simply illustrative in a bench trial of this man's activities. I mean, he's saying I used to play basketball. Well, give the court a picture of him with a basketball. I used to play guitar. Give him a picture of playing guitar. There's nothing more ominous than that. But these things were described as Mr. Freitas playing guitar in church. I mean, it was nuts. Okay, well, when did it come up that when did the church playing come up? The church came up on appeal in the brief that they filed. I thought at some point that Judge Feldman was speaking about playing the guitar at mass. I can answer that for you, Judge Jolly. What Judge Feldman, in explaining his reasons for judgment, in the context of a discussion, if I recall it, about malingering, said this is a man who not only liked playing the guitar for fun, but it was also part of his spiritual life when he attended mass. He liked to participate by playing the guitar. Now, somebody who had that. Was this when he was given his oral reasons for the bench? Yes, and what he said was this shows he's not a malingerer because somebody who had this additional spiritual component tied into playing the guitar, if there was any way he could have done it, he would have continued to do it. And his testimony was I can't do it. So what the judge thought was this indicates that there's more to Mr. Freitag's playing guitar than just enjoying strumming the guitar. He played it at mass, and Judge Feldman felt that this indicated that he was being malingering. And that's what he said, I believe, in his comments. Was there any conversation in any of these proceedings, formal or informal, about Judge Feldman's conversion to Catholic religion? I mean, I thought we heard that. Well, my recollection, I'm going back 17 months, is that in passing, and I think in connection with the conversation about the death of Justice Scalia, who was an intimate friend of Judge Feldman's, that somebody had thought that Judge Feldman was Jewish. He said, no, I've converted to Catholicism. But that is about it. In passing, it's a mere comment about his current religious status, period. I mean, gosh, what could be more logical? It wasn't a prolonged conversation. It was a pure status answer. It had nothing to do with proselytizing. It had nothing to do with comparing one faith versus another. He was not describing to you his spiritual experience. No, sir. Okay. No, sir. He emphasizes in the damage award amount more the credibility and persuasiveness of Dr. Gladden. So maybe I'd benefit if you'd shift to that issue. So, Gladden, did both parties get the medical report same time, and did they have an opportunity to depose him late that afternoon or not? Well, no. And here's why. The day before at 4 in the afternoon with one working day left before trial, they called us up on the phone and said we want to stipulate the liability so comparative fault's out the window. It means we don't have to call an accident reconstruction liability expert, so those guys are gone. They stipulate to a bench trial with Judge Feldman, and we say we're going to call one witness, Mr. Freitas. They also suggest, well, why don't we put in the medical evidence by reports? Fine. We agree. So there was never any Rule 26 requirement that Dr. Gladden produce a report in the first place, so we organized a narrative medical report to satisfy that proposal, and the next day after Mr. Freitas was examined, and Dr. Gladden came home a day early from a trip to see him, we got the report at the same time that they did, and we gave them to Judge Feldman to review them both. Now, Judge Feldman is very clear in his reasons for his judgment that he wasn't bamboozled into thinking, well, Dr. Gladden is this or Dr. Gladden is that. Whether he's a treating physician or a supervising physician, he was intimately involved with the care of Mr. Freitas, and also when the defendants were trying to get the case continued, they repeatedly referred to Dr. Gladden as the treating physician, and there are a half dozen records in the medical record from the University Medical Center that I've cited in our brief which show things that Dr. Gladden was doing with Professor Freitas, and, of course, at trial, Mr. Rudin cross-examined Professor Freitas on being seen and treated by Dr. Gladden. That's in the transcript, the record on appeal. You can't have your cake and eat it, too. But Judge Feldman was very clear that he was being objective. He knew that there's a difference between a supervising doctor and a treating physician. I don't know how else to answer that question, Judge. You've got time, but we did ask at the end there's some more concern about the mitigation question, and if it helps you, I'll phrase it two ways. One, I don't think Judge Feldman ever said that the defendants failed to show by a preponderance that he failed to mitigate. So we don't have a clear statement as to a finding on whether mitigation occurred or not, and then it seemed to me in the dialogue with Feldman on this point, he seems to think that the plaintiff has to do everything they can, but the standard is not that high. They've got to do what's reasonable. Well, the standard, as I appreciate it, Judge Higginson, is also that your failure to engage in physical therapy or whatever makes the injury worse. Now, what Mr. Freitas' testimony at trial was, the doctors at UMC told him to do a particular type of hand exercise. He testified to do that every day. When he got to Venezuela, which I think everyone recognizes is chaos, he saw a doctor and was told by a ball, squeeze the ball. There's nothing else you can do with a hand injury of that sort. Mr. Freitas testified, I purchased the ball, and every day, consistent with my doctor's recommendations, I do both exercises. So you're saying that Judge Feldman implicitly found they didn't meet their burden of proof. Yes, sir, because Mr. Freitas' factual testimony showed that he was fully compliant with what the two doctors told him to do. I thought Feldman said that it's unresolved, and then he just said, you know, I just think the number's the right number. Did he use the word unresolved? I did not get that sense. Mr. Freitas is somebody who's recovering or trying to recover from a very difficult injury. Dr. Gladden testified he's still affected by it. One year post-surgery, you're affected, it's not going away. And Freitas is doing everything he can to follow the doctor's instructions. It's not like they said, here's physical therapy here in the United States, you need to come to it. He can't do that. He'll lose his job. He works in Chile. The doctor testified he had reached maximum recovery? No. Oh, okay. No. I thought you said. Not Dr. Gladden. What Dr. Gladden said was that he believed that the problem in the arm was related to a condition that existed between the bone and the orthopedic plate, and the only way we're going to find out about what it is is a second operation. So that's not MMIR. Okay. I think this is a very straightforward case. The facts are the facts. There's been no showing here that Judge Fellman abused his discretion. Judge Fellman is the most veteran active trial judge in the Eastern District. He has seen this case hundreds of times. And I think that he gave everyone an eminently fair trial. You know, it was the defendants, it was their idea, we want a bench trial. In fact, Judge Fellman was so concerned about making sure that everything was fair, we had to agree in writing, and I prepared the stipulation myself, got the agreement of defense counsel to all the conditions that Judge Fellman insisted on. They knew he was going to be the person who determined quantum liability, all the issues. They said yes. We started trial Monday morning. Again, on the record, Judge Fellman asked the same question. Mr. Freitas was live and available in the courtroom, could have been cross-examined on anything and everything. The cross-examination is all of about 15 pages of transcript. It inquires into, I guess, a concussion. It inquires into medical bills from University Medical Center. And all of my plaintiffs' exhibits were admitted without objection. Now, there were some of them, three or four of them, subject of an objection when I wanted to amend the pretrial order, but there was no subsequent objection. The defendants did not come back to me and say, well, Richard, you have filed a supplemental pretrial order. We need to do the same thing because, as you know, in the district courts, there is a section, the exhibit section, where if you object to an exhibit, you're supposed to say so. They didn't do that. We had our final list of trial exhibits. No objection before the start of trial. At no point did they object. So I don't know what this furor is over photographs, but at the very least, they had 20 days before trial. At the very least. And nothing prevented them. Oh, Mr. Freitas appears to be playing left-handed. They could have had another deposition if they wanted one. And they already knew. Mr. Freitas testified, if you look at exhibit number two in the books I gave you, he's asked, are you a leftie or are you a righty? Well, I'm mostly a righty. And then on the next page, he talks about how he can't write anymore with his right hand. He has identified his penmanship is right-handed. So when you get into this issue, I guess, of cross-dominance, I'm thinking about Jimi Hendrix, who played left-handed. You're probably not old enough to remember him, Judge, at least when he was alive. I'm not going to answer that question. We do. He used to be a young man. There are loads of examples of people in life who are what we call cross-dominant. You think about all the baseball players that throw one way and bat the other because it's better for their batting average. There's nothing here. It is smoke and mirrors. This was, as Judge Feldman called it, a garden-variety rear-end collision case. And as always, the facts do not support anything that the defendants have argued. If we're talking about whether I know Jimi Hendrix, you probably made enough argument on your case. Well, in 1967, I saw him open up for the Monkees in this auditorium, and my concept of music changed forever at that point. First time that's ever come up before this Court. I think we have your argument. I don't have anything else to say. I think our brief was very clear. Every time they raised an issue, the facts of the case rebutted it. I don't know what else to add. Okay. Well, if you don't, then we'll have a seat. Thank you. To answer some of the questions, the photographs were produced after the close of Discovery. We tried to get Judge Feldman to continue the case to do Discovery. He said no. Just for the record, you're showing us a picture. Yes, they're on the record. I know, but just so the transcript reflects what you're doing. Yes, Justice. They're going to be showing you the photographs of the latest exhibit, 24A, C, and D. Yeah. And they raised more questions, left-handed or right-handed. Number two. Mitigation issues. Judge Dennis asked a question about what he said. Trial question. Mr. Rudin to Mr. Freitas. Question. Correct. You didn't have that. No. Judge Feldman. Mitigation issue from the transcript. Yes. I want to add, before I do that, mitigation is definitely an issue in this case. Whether the plaintiff has done everything that he could have done is frankly unresolved on this record. However, even assuming mitigation is a serious issue, mitigation does not outweigh or overwhelm the extent of plaintiff's injuries or the other violence of the incident regarding his mental well-being as well as his physical well-being. That's true. He mentions mitigation, but he doesn't do anything with it. You have to do some kind of analysis to see. What better, he admitted that he didn't do the PT, that he was getting free at UNC. Venezuela is a socialized medicine country. He did no formal PT. And all the doctors, Dr. Gladden, Dr. Williams, said all he needs is PT even now and he's fine. That's a six-month injury. Finally, Judge Feldman again. The Dr. Gladden thing. The reason why it's important is because he totally discounts Dr. Williams who did 42 tests, who said he's perfectly fine. And Dr. Gladden who says he's fine, except he claims he can't shake hands hard. That's what he did, Judge Feldman. In July of this year, the plaintiff was reexamined by a supervising orthopedic surgeon. That's his right before trial. There is some dispute as to whether he was the treating surgeon or the supervising surgeon. But nevertheless, Dr. Paul Gladden was intimately involved in the treatment of this plaintiff throughout the issues that he experienced. I cited every single medical record that shows he never examined this man until July. Why should he be given treating physician status? At least look at Dr. Williams who did 42 tests, who says there's no problem. He looked at him and just said it was 34 minutes only, even if it had a lot of tests built in. The physical exam was 34 minutes. The tests took, I don't know how long, but a lot more. He said the exam took 34 minutes, but the tests took more. Last seconds, Dr. Gladden's testimony. Surgery successful. Will heal fracture. Scar is healed. Judge Feldman went on and on about the scar and never looked at the scar on the written statement. He looked at a photograph two days after the surgery. Of course he looked like Dr. Frankenstein. Mr. Frankenstein never showed the scar to Dr. Feldman and Judge Feldman made a big deal about the scar. Well-healed scar according to one doctor. The hope was for occupational physical therapy follow-up in our clinic, which he didn't do. The patient elected to go to Colombia and then Venezuela and then Chile for personal financial reasons. Today is the first time I'm seeing him since he left New Orleans. The only finding was a subjective decrease in grip strength. Professor Frank says it's a spark-up. The doctor asked you to squeeze your hand and you know you squeeze it hard. You're going to get less money than squeeze it little. I don't know. But we didn't have a chance to depose Dr. Gladden. Thank you. Thank you, sir. That concludes the cases already argued for this week.